[Cite as *In re A.S.*, 2025-Ohio-3090.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

IN RE: A.S. AND T.M.S. :

: C.A. No. 30413

:

: Trial Court Case Nos. C-2020-001644-0N,0O,0P; C-2020-001647-0L,0M,0N

:

: (Appeal from Common Pleas Court-Juvenile Division)

:

: **FINAL JUDGMENT ENTRY & OPINION**

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on August 29, 2025, the judgments of the trial court are affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

*Christopher B. Epley*

CHRISTOPHER B. EPLEY, PRESIDING JUDGE

TUCKER, J., and LEWIS, J., concur.

**OPINION**
MONTGOMERY C.A. No. 30413


ROBERT ALAN BRENNER, Attorney for Appellant
MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellee


EPLEY, P.J.

{¶ 1} Appellant-Mother appeals from judgments of the juvenile court that overruled her objections to the magistrate's decision as untimely. For the reasons that follow, the judgments of the trial court are affirmed.

## I.     Facts and Procedural History

{¶ 2} A.S. and T.M.S. are the children of Mother and Father, born on February 14, 2018, and February 27, 2020, respectively. Mother and Father were never married.

{¶ 3} Montgomery County Children's Services ("MCCS") first became involved with the family at the time of T.M.S.'s birth when Mother tested positive for opiates and cocaine. Shortly thereafter, MCCS became concerned about the safety of the children's home; A.S. tested positive for elevated levels of lead, and domestic violence was alleged between the parents. The children—along with two other siblings who are not a part of this appeal—were removed from their home and placed with relatives on a safety plan. On May 7, 2020, A.S. and T.M.S. were placed in the interim temporary custody of MCCS. They were adjudicated dependent on September 1, 2020, and MCCS was granted temporary custody.

{¶ 4} MCCS filed for an extension of temporary custody in the spring of 2021, and hearings were held on the motions in June and August of that year. At the August hearing, Mother agreed to the extension. Later that fall, however, legal custody of A.S. and T.M.S was returned to Mother with protective supervision.

**{¶ 5}** Mother's care for the children lasted approximately a year. MCCS became re-involved in September 2022 after it received an emergency referral regarding physical abuse of one of Mother's other children at the hands of Father. Despite injuries, Mother did not seek medical attention for her child. Temporary custody was again granted to MCCS, and A.S. and T.M.S. were placed in a foster home.

**{¶ 6}** MCCS filed motions for extensions of temporary custody in July 2023. Mother agreed with the extensions for A.S. and T.M.S. but asked that the agency look at placing the children with friends, J.M. and N.M. After a home study, J.M. and N.M. were granted temporary custody.

**{¶ 7}** In the summer of 2024, MCCS filed a motion requesting that the court grant the J.M. and N.M. legal custody of A.S. and T.M.S. Mother challenged the motion, petitioning the court to return the children to her care. The guardian ad litem ("GAL") submitted a report recommending that the children be returned to her. A trial before the magistrate was held on November 4, 2024, and January 8, 2025. Although Father did not appear at the trial, he was represented by counsel, who expressed Father's desire that J.M. and N.M. have legal custody of A.S. and T.M.S.

**{¶ 8}** After hearing testimony from several witnesses, including Mother, the GAL, N.M., and the children's caseworker, and after considering many exhibits related to Father's criminal history, the magistrate granted legal custody of A.S. and T.M.S. to J.M. and N.M. The written magistrate's decision was filed on January 22, 2025. Mother filed objections 28 days later on February 19. The trial court overruled Mother's objections as untimely, and this appeal followed.

## II.      Untimely Filing of Objections

{¶ 9} In her brief, Mother raises two related assignments of error— both pertain to the untimely filing of her objections to the magistrate's decision, which granted legal custody of A.S. and T.M.S. to J.M. and N.M. Mother first asserts that the trial court abused its discretion by not accepting her late filing.

{¶ 10} According to Juv.R. 40(D)(3)(b)(i), "[a] party may file written objections to a magistrate's decision within fourteen days of the filing of the decision[.]" Juv.R. 40(D)(5) provides a late-filing party some "wiggle room" by granting an opportunity to explain why it was prevented from timely filing the objection. We review the trial court's decision to accept or reject an untimely objection for abuse of discretion. *White v. Grange Ins. Co.*, 2022-Ohio-497, ¶ 5 (2d Dist.). To constitute an abuse of discretion, a trial court's action must be arbitrary, unreasonable, or unconscionable. *Ojalvo v. Bd. of Trustees of Ohio State Univ.*, 12 Ohio St.3d 230, 232 (1984).

{¶ 11} In this case, Mother filed her objections to the magistrate's decision on February 19, 2025, 28 days after the decision was filed by the court and two weeks after the deadline set forth in Juv.R. 40(D)(3)(b)(i). As MCCS points out, though, Mother neither filed a request for an extension nor provided any reasons why her objections were late. Based on the plain language of Juv.R. 40(D)(3)(b)(i), we cannot say the court abused its discretion by rejecting Mother's untimely filing. Her first assignment of error is overruled.

## III.     Ineffective Assistance of Counsel

{¶ 12} Mother's second assignment of error argues that she was denied effective assistance of counsel because her attorney failed to file timely objections to the magistrate's decision.

{¶ 13} To prevail on an ineffective assistance of counsel claim, a defendant must prove that her attorney was ineffective under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The test has two parts. First, she must show that counsel's performance was deficient. *Strickland* at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Id.*

{¶ 14} With respect to the first prong, much deference is given to trial counsel. "[A] court must indulge in a strong presumption that the challenged action might be considered sound trial strategy. Thus, judicial scrutiny of counsel's performance must be highly deferential." *State v. Bird*, 81 Ohio St.3d 582, 585 (1998). To demonstrate prejudice, the second prong, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136 (1998), first paragraph of the syllabus.

{¶ 15} In this case, Mother's trial attorney missed the deadline to file objections to the magistrate's decision by two weeks and failed to ask for an extension of time as provided by Juv.R. 40(D)(5). We can perceive no strategic reason to file objections late and thus find that Mother's counsel was deficient.

{¶ 16} We now move to the second prong of the *Strickland* analysis—prejudice. Mother's objection only generally claimed that the magistrate's decision was against the manifest weight of the evidence. The record does not contain a transcript of the trial to aid in our prejudice analysis; nevertheless, it does contain other documents we can use to determine if "[t]he likelihood of a different result . . . [is] substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111-112 (2011).

{¶ 17} Throughout most of the history of this case, MCCS and the court had concerns about Mother's fitness and ability to care for her children. Agency involvement began at T.M.S.'s birth when Mother tested positive for drugs, and the newborn was discharged from the hospital under the care of a relative. At that same time, A.S. tested positive for elevated levels of lead, likely from housing environment hazards. In 2023, Mother was charged and convicted of OVI-related misdemeanor offenses. She allegedly commented that it was "no big deal."

{¶ 18} Mother has also consistently struggled with housing issues. She mostly lived with family or friends or in hotels for years, and after she found her own residence in 2023, she was, according to the agency, evicted for non-payment of rent. The GAL's April 2024 report noted that Mother was living with her father and did not have independent housing at that time. Relatedly, it appears that Mother has historically been unemployed or underemployed, working for short stints at McDonald's and Meijer.

{¶ 19} The most recent semiannual review by MCCS from August 20, 2024, stated that the agency had doubts as to Mother's ability to keep A.S. and T.M.S. safe. Mother had failed to protect and supervise her children, which led to an older sibling—not involved in this appeal—being injured after an assault by Father. Mother did not seek medical attention for the child. MCCS also found a history of domestic violence between Mother and Father. The report stated that although Mother had completed parenting classes, she was reluctant to engage in workshops and struggled to understand child development and appropriate interactions with children when it came to conflict.

{¶ 20} Even though for the vast majority of MCCS's involvement with Mother and her children there had been significant concerns, there was evidence that would suggest Mother had made improvements in her life. For instance, the most recent GAL report from

November 2024 indicated that Mother had obtained housing, was employed at Miami Valley Hospital South as a patient dining associate, was in counseling, and was no longer in contact with Father. It also appears from the GAL's report that Mother was no longer on probation from her OVI-related charges, though she had no license. In fact, the GAL recommended that Mother be granted legal custody of A.S. and T.M.S.

{¶ 21} A.S. and T.M.S. have lived with J.M. and N.M. since February 2024. According to the evidence in the record, the children shared a room in the four-bedroom home, which the case worker described as "safe and appropriate." A.S. was doing well in a good school, and T.M.S. was on a preschool waitlist while being cared for by N.M., a stay-at-home parent. The children had all their medical and emotional needs met, and the case worker reported that "[b]oth girls have adjusted to the . . . home and they appear to be happy and well-taken care of[.]" The GAL wrote that "[J.M. and N.M.] are doing a wonderful job ensuring the girls' basic needs are met." It is also important to note that Mother asked J.M. and N.M. to care for the children.

{¶ 22} Based on the record, we cannot say that there was a reasonable probability that the result of the case would have been different had Mother's trial attorney filed timely objections to the magistrate's opinion. The evidence in record supports the grant of legal custody to J.M. and N.M. Therefore, the second assignment of error is overruled.

## IV.    Conclusion

{¶ 23} The judgments of the trial court are affirmed.

. . . . . . . . . . . . .

TUCKER, J., and LEWIS, J., concur.